**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| LINDA D. EPPS,<br>　　　Plaintiff<br>　　　v.<br>POTOMAC ELECTRIC POWER<br>COMPANY,<br>　　　Defendant |

Civil Action No. 18-1423 (CKK)

**MEMORANDUM OPINION**
(March 31, 2021)

Plaintiff Linda D. Epps ("Plaintiff") was employed by Defendant Potomac Electric Power Company ("PEPCO" or "Defendant") from February 22, 1994 until her termination on June 21, 2018. Beginning in March 2006, Plaintiff went on disability leave due to a depressive illness. In June 2016, PEPCO informed Plaintiff that she would be terminated unless she returned to work. Plaintiff contends that she attempted to return to work, but alleges that Defendant discriminated against her by failing to reinstate her and ultimately terminating her employment. Plaintiff brings claims for disability discrimination under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court shall GRANT PEPCO's Motion for Summary Judgment because PEPCO has

---

[1] The Court's consideration has focused on the following documents: Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 32-1; Plaintiff's Memorandum of Points and Authorities in Opposition to Summary Judgment ("Pl.'s Opp'n"), ECF No. 33; and Reply in Support of Defendant's Motion for Summary Judgment ("Def.'s Reply"), ECF No. 34. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f).

offered a legitimate, non-discriminatory reason for terminating Plaintiff's employment, which Plaintiff has failed to rebut with sufficient evidence to demonstrate discriminatory pretext.

## I.   BACKGROUND

### A.  Procedural Background

Plaintiff filed her Complaint in this action on June 15, 2018.  *See* Compl., ECF No. 1. Plaintiff sued both PEPCO and its parent company, Exelon Corporation.  *Id.*  In her Amended Complaint, filed with leave of the Court on September 26, 2018 (*see* Sept. 26, 2018 Minute Order), Plaintiff alleges that PEPCO and Exelon engaged in "unlawful employment discrimination" by refusing to return her to work and terminating her employment because of "her history of disability and the perception that she is disabled."  Am. Compl. ¶¶ 21, 22, ECF No. 9.  Plaintiff brings her claims under Title I of the ADA and the DCHRA.

PEPCO and Exelon moved to dismiss the Amended Complaint.  *See* Defs.' Mot. to Dismiss, ECF No. 10.  The Court granted in part the motion to dismiss, holding that Plaintiff's ADA claim was timely "*only* with respect to acts occurring on or after September 19, 2017" and her DCHRA claim "encompasses *only* those acts occurring on or after June 14, 2017."  Mem. Op. at 9–10, ECF No. 15 (emphases added).  After Plaintiff sought reconsideration of the Court's order, *see* ECF No. 17, the Court clarified that any allegations underlying Plaintiff's ADA claim "occurring on or after May 23, 2017 are timely."  Order, ECF No. 23.

On August 6, 2019, the parties filed a Joint Stipulation dismissing Exelon Corporation from this action and leaving PEPCO as the only defendant. *See* Joint Stip., ECF No. 20. The remaining parties completed discovery, and now PECPO moves for summary judgment.

### B.  Factual Background

Plaintiff Linda Epps was hired by PEPCO in 1994.  Def.'s Stmt. ¶ 1.[2]  In 2006, Plaintiff worked as a "Senior Administrative Assistant" in PEPCO's Financial Administration Department. *Id.* ¶¶ 1–3.  In this position, Plaintiff was represented by a bargaining unit of Local 1900 of the International Brotherhood of Electrical Workers (the "Union") and her employment was subject to a collective bargaining agreement between the Union and PEPCO.  *Id.* ¶ 5.

In March 2006, Plaintiff went on disability leave due a depressive illness.  *Id.* ¶ 6.  She received short-term, and then long-term disability benefits, including her full-time salary for two years.  *Id.* ¶ 8.  Her long-term disability benefits ended in approximately March 2008.  *Id.* ¶ 9. Based on the operative CBA (covering the time period when Plaintiff first went on leave), Plaintiff should have been terminated from the company in March 2010, two years after the expiration of her long-term disability benefits.[3]  *Id.* ¶¶ 10–11.  PEPCO indicates that it "inadvertently failed" to terminate Plaintiff from its employment rolls at that time.  *Id.* ¶ 11; *see also* Def.'s Mot. Ex. 10, Declaration of Jill D. Flack ("Flack Decl.") ¶ 9, ECF No. 32-13 ("Pepco should have terminated

---

[2] In resolving the present motions, this Court "assume[s] that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 7(h)(1).  Thus, in most instances the Court shall cite to Defendant's Statement of Undisputed Facts, ECF No. 32-2 ("Def.'s Stmt.") unless Plaintiff objects to relevant aspects of a fact proffered by Defendant.  In such instances, the Court shall also cite to Plaintiff's Response to Defendant's Statement, ECF No. 33-49 ("Pl.'s Resp. Stmt.") or otherwise indicate that the fact is disputed.  The Court shall also cite directly to the record, where appropriate, to provide additional information not covered by Defendant's Statement.

[3] Plaintiff contends that during her disability leave, Plaintiff "did not provide notice to Ms. Epps that there was a time limit for her leave, that her job was not being held for her, or that she would be terminated if she did not return to work."  Pl.'s Opp'n at 6.  Plaintiff, however, does not dispute that her employment was subject to a CBA which explicitly set forth Pepco's procedure for terminating employees after their eligibility for disability leave expired.  *See* Pl.'s Resp. Stmt. ¶ 10; Def.'s Mot. Ex. 11, PEPCO-IBEW Wage Classification Agreement, 2004–2008, at PEP00024, ECF No. 32-14.

Ms. Epps's employment two years after her long-term disability benefits ended, or around March 2010, but mistakenly did not.").  Plaintiff does not dispute that she should have been terminated in 2010 or that PEPCO's failure to do so was a mistake; she merely notes that pursuant to the CBA, PEPCO would have been required to provide her notice before terminating her.  Pl.'s Resp. Stmt. ¶ 11.

Plaintiff began receiving federal social security benefits in 2009, based on her inability to work.  Def.'s Stmt. ¶ 14; *see also* Def.'s Mot. Ex. 1 (part 1), Deposition of Linda Epps ("Epps Dep.") 38:7–19, ECF No. 32-3.  She continued to receive federal social security benefits through at least the date of her deposition, February 3, 2020.  Def.'s Stmt. ¶ 14; Def.'s Mot. Ex. 1 (part 1), Epps Dep. 36:3–10, 38:12–15.  Plaintiff also received health insurance for herself and her daughter from PEPCO at no cost to her through her termination in June 2018.  Def.'s Stmt. ¶ 12; Def.'s Mot. Ex. 1 (part 1), Epps Dep. 97:12–98:1.

In 2016, PEPCO began to contact individuals on its employment rolls who had been on long-term disability leave to identify people eligible to return to work and to provide the notice required by the CBA to those who could not return to work that they would be terminated.  Def.'s Stmt. ¶¶ 15–16.  Defendant sent a letter pursuant to Section 8.06(d) of the CBA to Plaintiff on June 23, 2016 ("Section 8.06 Notice"), which stated:

> Based on the information submitted to the Company . . . it appears that you are unable to return to work in your assigned position, **Senior Admin Asst.** due to your medical condition.  If, however, your health care provider certifies that your condition allows you to work with medical restrictions, [PEPCO] will work with you and your provider to determine whether a reasonable accommodation can be made for you to perform the essential functions of your job .  If a modification or adjustment is not reasonable or possible in the position you held prior to taking leave, the Company may consider alternative positions available for which you believe you are qualified.

Def.'s Mot. Ex. 14, Section 8.06 Notice at PEP01162, ECF No. 32-17 (emphasis in original).  It also directed Plaintiff to submit any request for an accommodation by August 23, 2016 and notified her that PEPCO would "terminate [her] employment" if it received no response.  *Id.*

In response to PEPCO's Section 8.06 Notice, Plaintiff's therapist, Ms. Carole Carter Ranta, a licensed clinical professional counselor, sent a letter dated August 5, 2016, which stated that Plaintiff had "made good progress in dealing with her illness and will be able to return to work after August 23, 2016."  Def.'s Stmt. ¶ 22; Def.'s Mot. Ex. 15, 8/5/2016 Letter from Carole Ranta, ECF No. 32-18.  Ms. Ranta also recommended certain "accommodations" for Plaintiff, including that she not return to the same department in which she previously worked, and that she be placed "in a location in closest proximity to her residence" to "lessen her stress level and she acclimates herself to the work force."  Def.'s Mot. Ex. 15, 8/5/2016 Letter from Ms. Ranta.

Ultimately, Plaintiff was not returned to work and was formally terminated from PEPCO in June 2018.  Def.'s Stmt. ¶ 41.  Plaintiff's claims in this action arise from events during the intervening period between June 2016 and June 2018—though, as noted *supra* Section I(A), her remaining claims are limited to events occurring after May 23, 2017 for her ADA claim and after June 14, 2017 for her DCHRA claim.

### 1. Efforts to Determine Plaintiff's Medical Ability to Return to Work (2016–2017)

The parties' summary judgment briefing discusses in detail Plaintiff's interactions with Ms. Marie Robertson, a nurse in PEPCO's Occupational Health Services Group who was responsible for helping to determine whether an individual's "return to work" from disability leave was "medically supported."  Def.'s Stmt. ¶ 25; *see* Pl.'s Opp'n at 6–16.  Because Plaintiff requested accommodations, Ms. Robertson was required to determine if Plaintiff's requests were medically supported based on her diagnosis, treatment, and prognosis.  *See* Def.'s Mot. Ex. 2, Deposition of

Marie Robertson ("Robertson Dep.") 32:11–16, ECF No. 32-5 (confirming that her role involves assessing "information provided by the doctor" to determine "whether or not the medical information supported [any] requested accommodation"). Many of Plaintiff's interactions with Ms. Robertson fall outside the time period for her remaining claims. The Court shall, however summarize some of these interactions to provide context for Plaintiff's claims within the permitted time period.

Beginning in the fall of 2016, Plaintiff and Ms. Robertson were in contact about obtaining documentation from Plaintiff and her therapist to assess her medical ability to return to work and to determine the necessity of Plaintiff's requested accommodations. Def.'s Stmt. ¶¶ 24–26. Ms. Robertson requested documentation from Plaintiff and her therapist, Ms. Ranta, over the course of several months. *See id.* ¶¶ 26–28. Ms. Robertson testified that she requested information from Plaintiff and Ms. Ranta regarding Plaintiff's "diagnosis, prognosis, specific treatment plan, and return to work planning," but never received this information. Def.'s Mot. Ex. 2, Robertson Dep. 55:4-18, 61:10–16. Rather, according to PEPCO, Ms. Ranta sent Ms. Robertson "identical, instead of additional, information." Def.'s Stmt. ¶ 28; *see* Def.'s Mot. Ex. 15, 8/5/2016 Letter from Carole Ranta; Def.'s Mot. Ex. 16, 1/10/2017 Letter from Carole Ranta, ECF No. 32-19; Def.'s Mot. Ex. 8, Deposition of Carole Ranta ("Ranta Dep.") 123:9–124:17, ECF No. 32-11 (indicating that Ms. Ranta did not send any "new" information between August 2016 and January 2017); *id* at 123:9–124:17 (noting that January 2017 letter was "pretty close" to earlier letter and that Ms. Ranta did not provide "any new information"); Def.'s Mot. Ex. 1 (part 2), Epps Dep. 162:22–163:6, ECF No. 32-4 (agreeing that Ms. Ranta sent "pretty much the same" information to Ms. Robertson in August 2016 and January 2017). In her deposition, Plaintiff agreed that "[a]s far as [she] kn[ew]" between August 2016 and May 2017, "Ms. Ranta has basically provided a few sentences about

[her] treatment, the fact that [she] made progress, and a few notes from an independent evaluation, and that's all" and there was nothing in any of the documents provided "that explains anything further about [her] treatment or the need for [her] accommodations."  Def.'s Mot. Ex. 1 (part 2), Epps Dep. 207:9–20.

In April 2017, Ms. Robertson requested that Plaintiff be evaluated by a higher-level practitioner.  Def.'s Stmt. ¶ 29; Def.'s Mot. Ex. 2, Robertson Dep. 55:4–18.  Ms. Robertson testified that—over the course of these communications—she requested, but never received, adequate documentation of Plaintiff's "[h]istorical diagnosis, prognosis, treatment plans, [and] expansion on this information." Def.'s Mot. Ex. 2, Robertson Dep. 61:13–16.  She also explained that the notes she received from the higher-level practitioner consisted of a "conversation" between that practitioner and Plaintiff, but provided no mention of a "treatment plan or any prognosis." *Id.* at 83:16–84:2.

The parties dispute whether Plaintiff provided the documentation required for Ms. Robertson to determine whether Plaintiff was medically able to return to work and what, if any, accommodations would be appropriate. Plaintiff contends that "Ms. Robertson received all the medical documentation she requested" and that "Ms. Robertson told Ms. Epps that she had *all* the medical documentation she needed to move the process forward."  Pl.'s Resp. Stmt. ¶ 28 (emphasis added).  In support of this contention, Plaintiff cites a May 2, 2017 text message from Ms. Robertson to Plaintiff indicating that "the documentation is received and reviewed." Pl.'s  Opp'n Ex. 16, 5/2/201 Text Message. Contrary to Plaintiff's repeated assertion throughout her briefing, this text message does *not* confirm that Ms. Robertson had indeed received *all* the appropriate documentation or information from Plaintiff required to approve her return to work or requested accommodations.  Rather, Ms. Robertson explained during her deposition that she sent this text

message to Plaintiff to confirm receipt of a specific document that she had asked Plaintiff to send at the time, noting that Plaintiff had previously had difficulty transmitting documents by fax.  *See* Def.'s Reply Ex. 44, Robertson Dep. 90:4–91:4.

As of August 2017, Ms. Robertson concluded that she had not received adequate documentation and stated in an email to Ms. Jill Flack, PEPCO's Assistant General Counsel, that she could not "in good conscience 'approve' the return to work. Lack of appropriate documentation is the premise."  Pl.'s Opp'n Ex. 21, 8/2/2017 Email from Marie Robertson, ECF No. 33-21; *see also*  Def.'s Mot. Ex. 2. Robertson Dep. 63:16–64:15 (explaining that "anyone could write [a letter clearing Ms. Epps to work]," and that "there was nothing provided for us . . . to support the statements").

### 2.  Efforts to Identify an Appropriate Vacant Position (2017–2018)

Despite Ms. Robertson's conclusion that she lacked adequate medical documentation to "approve" Plaintiff's return to work after more than a decade of disability leave, PEPCO employees searched for vacant positions for Plaintiff.  Def.'s Stmt. ¶ 31.  Plaintiff does not provide any evidence to controvert the fact that PEPCO's efforts to identify a position for her continued even after Ms. Robertson's conclusion that she did not have sufficient documentation to "approve" her return to work from a medical perspective.

In 2017, Joshua Davis of PEPCO's Human Resources department was tasked with searching for a vacant position for Plaintiff.  *Id.* ¶  34.  In September 2017, Mr. Davis indicated that he had searched the "current job openings on the [PEPCO] intranet site," but concluded that "there are currently no open positions that I believe will be comparable to [Plaintiff's] former position of Admin Assistant."  Def.'s Mot. Ex. 24, 9/18/2017 Email from Joshua Davis, ECF No. 24.  He identified the "Service Associate" position as one for which Plaintiff "*may* be a fit" and

requested assistance from Ms. Bonnie Batres, a recruiter at PEPCO, to identify any potential Service Associate positions that may be vacant.  *Id.* (emphasis added).  Ms. Batres responded that she was aware of a potential Service Associate position in Forestville, but noted that it had not yet been approved for posting by management.  *See* Def.'s Mot. Ex. 25, 9/18/2017 Email from Bonnie Batres, ECF No. 32-28; Def.'s Mot.  Ex. 7, Deposition of Bonnie Batres ("Batres Dep.") 9:8–10:9, ECF No. 32-10.  Ms. Batres later indicated to Mr. Davis that this post had been "pending" approval by management for several months, and it "appears as though there is no longer a need."  Def.'s Mot. Ex. 26, 10/10/2017 Email from Bonnie Batres, ECF No. 32-29.  Mr. Davis then confirmed that he learned that it was not a priority for the company to fill that position and that there were no other positions "comparable" to Plaintiff's administrative role available.  *Id.* 10/10/2017 Email from Joshua Davis.

After additional searches by PEPCO employees for vacant positions, on January 18, 2018, Ms. Flack emailed Plaintiff's attorney, Ms. Loretta Townsend to explain that PEPCO would provide Plaintiff the opportunity to identify "open and available positions within the Company for which she believes she may be qualified."  Def.'s Mot. Ex. 29, 1/18/2018 Email from Jill Flack, ECF No. 32-32.  Ms. Flack noted that the "Administrative Assistant" position Plaintiff had previously held "no longer exists," and advised Ms. Townsend that Plaintiff "must identify a position or positions for which she believes she is otherwise qualified."  *Id.*  Ms. Flack "encouraged" Plaintiff to use the "Exelon Career Opportunity System (available to her through Exelon's website) to search for positions that may meet her experience, qualifications, and any restrictions."  *Id.*  She also noted that Karen Gentry-May, a PEPCO HR employee would be available to answer questions and assist with searching job postings.  *Id.*  Ms. Flack further explained that if Plaintiff was not able to identify any available positions or if she could not meet

the qualifications for any available positions by April 20, 2018, her employment would be terminated. *Id.*

On March 1, 2018, Ms. Townsend emailed Ms. Flack indicating that Plaintiff "informs me that she wishes to be returned to the position of Service Associate with the [P]ower Delivery Administration.  The Union president has provided this information."  Def.'s Mot. Ex. 30, 3/1/2018 Email from Loretta Townsend, ECF No. 32-33.   PEPCO offers evidence that there was *no* department called the "Power Delivery Administration."   Def.'s Reply Ex. 48, Declaration of Karen Gentry-May ("Gentry-May Decl.") ¶ 9, ECF No. 34-9, nor was there any available Service Associate or other administrative position in the department in which Plaintiff worked before she went on leave (which was called the "Business Planning and Support" department in 2018).  Def.'s Reply Ex. 41, Declaration of Marc Robinson ("Robinson Decl.") ¶ 10, ECF No. 34-2.  According to Plaintiff, however, the president of the Union told her it was not true that the "Administrative Assistant" role no longer existed—as Ms. Flack had suggested in her January 2018 email.  Def.'s Mot. Ex. 1 (part 2), Epps. Dep. 228:3–12.

PEPCO, however, indicates that the "Administrative Assistant" role was eliminated in 2012 during CBA Negotiations, and did not exist when Plaintiff sought to return to work.  Def.'s Stmt. ¶¶ 19–20.  When it eliminated "Administrative Assistant" positions, PEPCO created a new "generic" position of "Service Associate."  *Id.* ¶  19.  PEPCO's employees testified consistently that although these two positions had similar or overlapping responsibilities, they were not identical; the responsibilities of a Service Associate varied depending on the department, but generally involved more complex or different skills than the Administrative Assistant position it replaced.  *See, e.g.*, Def.'s Mot. Ex. 10, Flack Decl. ¶ 15 ("'Service Associate' was a generic title given to the new position in all these departments; however, the duties of the role vary significantly

10

depending on the department, and Service Associates were required to perform a broader range of tasks than were required in the eliminated roles."); Def.'s Mot. Ex. 3, Deposition of Joshua Davis ("Davis Dep.") 79:4–14, ECF No. 32-6 (stating that the service associate and administrative assistant positions were "close" but "there were still a lot of different skill sets"); *id.* at 79:15–81:1, 112:2-10 (noting that the skills for service associates varied depending on the department); Def.'s Mot. Ex. 5, Deposition of Karen Gentry-May ("Gentry-May Dep.") 34:13–20, ECF No. 32-8 (stating that some of the "functions" of the administrative assistant were "combined into a new position"); *id.* at 35:2–5 (noting that a "service associate" position was "more complex in terms of the work that the do"); Def.'s Reply Ex. 41, Robinson Decl. ¶ 7 ("The Service Associate position in the Business and Planning Support department (previously Financial Administration department) is different from the prior role of Administrative Assistant. It encompasses a broader and more complex range of duties that the prior Administrative Assistant role[.]").

Plaintiff attempts to rebut PEPCO's evidence to show that the two roles were identical by citing to the 2012 Service Associate Agreement, which established the Service Associate position. Pl.'s Resp. Stmt. ¶ 19.   She notes that all the employees who had previously occupied "Senior Administrative Assistant" positions were given new "Service Associate" titles. Pl.'s Opp'n Ex. 30, 2012 Memorandum of Understanding Pepco/Local 1900, IBEW, Service Associate Agreement, at PEP00631, ECF No. 33-30.  The Service Associate Agreement, however, does not controvert PEPCO's explanation that these were two different positions; rather it expressly states that the "Administration Assistant progression shall be *deleted*" and all employees previously occupying those roles would be "transferred" to the "new" Service Associate position.  *Id.* at PEP00630 (emphasis added).

Consistent with PEPCO's position that the Service Associate role was not identical to Plaintiff's former administrative position, Ms. Flack responded to Ms. Townsend's email, reiterating that the Service Associate position was "not the same position that Ms. Epps left nearly 12 years ago" and "[e]ven if it was the same position – which it is not – the Company has no obligation to hold a position for Ms. Epps or create a position for her 12 years after she left the position."  Def.'s Mot. Ex. 30, 3/1/2018 Email from Jill Flack.

Later in March 2018, Ms. Townsend again reported that she and Plaintiff had searched the company website for available jobs, but noted that there was "nothing that even remotely meets her qualifications." Def.'s Mot. Ex. 31, 3/7/2018 Email from Loretta Townsend.  Ms. Flack confirmed to Ms. Townsend that the company's website was the appropriate forum to search for jobs, and that Plaintiff should contact Ms. Gentry-May for assistance in searching the job postings. *Id.* 3/7/2018 Email from Jill Flack.  Ms. Gentry-May also stated that she was searching for available positions for Plaintiff throughout this time period. *See* Def.'s Reply Ex. 48, Gentry-May Decl. ¶ 5.

On March 26, 2018, Ms. Gentry-May reported to Ms. Flack that she had spoken to Plaintiff about her job search.  Plaintiff had expressed that she had not seen any vacant Service Associate positions or any other positions "that looked similar to the work she did in the past."  Def.'s Mot. Ex. 32, 3/26/2018 Email from Karen Gentry-May, ECF No. 32-35.  Ms. Gentry-May also noted that she had advised Plaintiff to "look broadly at all the positions" to identify any potential positions with skills that would match her experience or interest, noting that Plaintiff had mentioned interest in "accounting, payroll and invoices."  *Id.*

On March 29, 2018, Ms. Townsend again contacted Ms. Flack to indicate that Plaintiff had not identified any "jobs available in her old job title."  Def.'s Mot. Ex. 33, 3/29/2018 Email from

Loretta Townsend, ECF No. 32-36.  And again on April 3, 2018, Ms. Townsend reported that she and Plaintiff had checked the company's website for available jobs, and concluded that "[t]here is nothing that Ms. Epps is qualified to apply for as most are technical jobs like engineer or mechanic." Pl.'s Opp'n Ex. 41, 4/3/2018 Email from Loretta Townsend, ECF No. 33-41.  Ms. Townsend also asked if there "[a]re any other jobs available to [Plaintiff]." *Id.* Ms. Flack responded that she was "not aware" of any other positions that are currently vacant and available other than those posted on the company's website.  *Id.* 4/3/2018 Email from Jill Flack.

Ms. Flack then asked an employee in PEPCO's recruiting department if there were any positions that are "posted as strictly internal." Pl.'s Opp'n Ex. 38, 4/3/2018 Email from Jill Flack, ECF No. 33-38.  Ms. Batres later responded that there "are in fact certain positions that are posted internally only. Examples would include union positions . . . or supervisory or management positions in which we expect to have internal talent." *Id.* 4/4/2018 Email from Bonnie Batres.  Ms. Batres provided a list of positions since October 2017 that had been posted internally; the list included five service associate positions that had all been filled between September 2017 and February 2018. *Id.* 4/9/2018 Email from Bonnie Batres.  Plaintiff points to this internal PEPCO email discussion to show that PEPCO "actively concealed" internal job postings from her by not giving her access to its intranet site.  However, Ms. Gentry-May testified in her declaration that she had "searched vacancies that were posted *both* internally on the Company's intranet *and* externally on the Company's website" and that she "spoke to managers in different departments to inform that that I was trying to find a role for Ms. Epps to see if any of their open positions would be a good fit, or if they have any positions not yet posted but that would be opening soon for which she might have been qualified."  Def.'s Reply Ex. 48, Gentry-May Decl. ¶ 4 (emphasis added). Despite these efforts, Ms. Gentry-May did not identify any suitable vacancies.  *Id.* ¶ 4.

13

PEPCO indicates that by the end of April 2018, Plaintiff had not identified any vacant positions that appeared to meet her qualifications. Def.'s Stmt. ¶¶ 38, 40. Plaintiff disputes this fact, noting that she had "identified a Service Associate position in the Power Delivery Administration, where she had previously worked," referring to her earlier conversation with the Union president. Pl.'s Resp. Stmt. ¶ 40. Plaintiff does not identify any other vacant positions for which she believed she would be qualified during this time period. Because of the failure to identify any available position for Plaintiff by this time, Ms. Flack recommended that her employment be terminated. Def.'s Stmt. ¶ 42. Plaintiff was formally terminated from PEPCO on June 20, 2018. Def.'s Mot. Ex. 35, Letter from Leah Covington, ECF No. 32-38.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a

genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009); *see also Sibert-Dean v. Wash. Metro. Transit Auth.*, 751 F. Supp. 2d 87, 90 (D.D.C. 2010) (requiring the non-moving party's factual representations in a sworn affidavit to be supported by facts in the record).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor.  *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  The district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution."  *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876,

879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*). But the Court's "special caution" does not relieve the plaintiff of her burden to support her allegations with competent evidence. *See Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage she bears the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III.    DISCUSSION

Plaintiff's claims arise under the ADA and DCHRA. The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The DCHRA forbids covered employers from terminating any individual "wholly or partially for a discriminatory reason based upon the actual or perceived . . . disability . . . of any individual." D.C. Code  § 2–1402.11(a). When evaluating claims under the DCHRA, "decisions construing the ADA [are considered] persuasive." *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) (quoting *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583–84 (D.C. 2001)).

To demonstrate discrimination in violation of the ADA or the DCHRA, a plaintiff "must prove that [s]he had a disability within the meaning of the ADA, that [s]he was 'qualified' for the position with or without a reasonable accommodation, and that [s]he suffered an adverse employment action because her disability." *Id.* (quoting *Duncan v. Wash. Metro. Area Transit*

*Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001)); *see also Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) ("[T]he two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of [her] disability.").

Absent direct evidence of discrimination,[4] the plaintiff may indirectly prove discrimination pursuant to the tripartite burden-shifting articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See Adeyemi*, 525 F.3d at 1226–27 (applying *McDonell Douglas* to ADA claim); *Ottenberg's Bakers, Inc. v. D.C. Comm'n on Human Rights*, 917 A.2d 1094, 1102 (D.C. 2007) ("In reviewing discrimination cases under the [DCHRA], we apply the familiar burden-shifting test set forth by the Supreme Court in *McDonnell Douglas*[.]"); *Ingram v. D.C. Family & Child Servs. Agency*, 394 F. Supp. 3d 119, 126 (D.D.C. 2019) ("[B]oth [the] ADA and DCHRA disability discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework). "Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if she does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination." *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 64 (D.D.C. 2016) (citing *McDonnell Douglas*, 411 U.S. at 802–05).

On summary judgment, however, if the employer puts forth a "legitimate, non-discriminatory reason" for its actions, the "question whether the employee actually made out a prima facie case is no longer relevant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493

---

[4] "Direct evidence of discrimination is evidence that, if believed by the factfinder, proves the particular fact in questions *without any need for inference*." *Brown v. Small*, 437 F. Supp. 2d 125, 130 n.7 (D.D.C. 2006) (emphasis in original) (citing *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)).

(D.C. Cir. 2008) (internal citations and quotation marks omitted).  "[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original).  Rather, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee[?]" *Id.* (citations omitted); *see also Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008) (noting that in evaluating DCHRA claim, the Court "need not pause to analyze whether [plaintiff] made out a *prima facie* case" because defendant "produced evidence that it suspended [plaintiff] for a legitimate, non-discriminatory reason").  If a plaintiff fails to produce evidence for a reasonable jury to find that the employer's legitimate, non-discriminatory reason was not the actual reason for the employer's action, then summary judgment in favor of the employer is proper.  *See Brady*, 520 F.3d at 496–97. When considering whether summary judgment is warranted for the employer in an employment discrimination case, the court considers all relevant evidence presented by the plaintiff and defendant. *See id.* at  494–95.

Although both parties devote significant discussion to Plaintiff's *prima facie* case, the D.C. Circuit has made clear that "the prima-facie-case aspect of *McDonnell Douglas* is irrelevant [in the ADA context] when an employer has asserted a legitimate, non-discriminatory reason for its decision—as an employer almost always will do by the summary judgment stage of an employment discrimination suit." *Adeyemi*, 525 F.3d at 1226; *see also Brady*, 520 F.3d at 494 (directing that the district court "*should not*" decide whether a Plaintiff has made out a prima facie

case where the employer has asserted a legitimate, non-discriminatory reason for its adverse employment decision).

**A. PEPCO has articulated a legitimate, non-discriminatory reason for not returning Plaintiff to work and terminating her employment.**

Here, PEPCO has asserted a legitimate, non-discriminatory reason for not reinstating and then terminating Plaintiff: there was no vacant position for which Plaintiff was qualified when she sought to return to work. *See* Def.'s Mot. at 19; Def.'s Reply at 9. The record supports this justification. PEPCO has produced evidence that its employees searched the internal and external job postings over the course of several months, and were unable to identify a position for which they believed Plaintiff was qualified.  *See, e.g.*, Def.'s Mot. Ex. 3, Davis Dep. 22:2–10, 46:21–47:2; Def.'s Mot. Ex. 4, Flack Dep. 29:7–17; Def.'s Mot. Ex. 5, Gentry-May Dep. 17:9–20:7; Flack Decl. ¶¶ 18, 20; Def.'s Mot. Ex. 24, 9/18/2017 Email from Joshua Davis; Def.'s Mot. Ex. 25, 926/2017 Email from Joshua Davis; Def.'s Mot. Ex. 31, 3/7/2018 Email from Jill Flack; Def.'s Mot. Ex. 32, 3/26/2018 Email from Karen Gentry-May; Def.'s Mot. Ex. 33, 3/29/2018 Email from Loretta Townsend.

Plaintiff attempts to rebut PEPCO's legitimate non-discriminatory reason by offering evidence to show (1) that she was "qualified" for Service Associate positions; and (2) that PEPCO concealed vacant Service Association positions from her.  *See* Pl.'s Opp'n at 19–25, 36–38.  In other words, Plaintiff attempts to show that PEPCO's stated reason is false.  For the reasons discussed below, the Court finds that Plaintiff has failed to produce sufficient evidence to rebut PEPCO's stated reason that it did not return her to work because it was unable to identify a vacant position suitable to Plaintiff's skills and experience.

Plaintiff first argues that she was "qualified" for Service Associate positions, based on her belief that this position was identical to the "Administrative Assistant" position she held before

she went on leave.[5]   *See id.* at 19–21.   Although Plaintiff testified that she was told by the Union president that these two positions were the same, she offers no evidence to controvert the deposition testimony and declarations of PEPCO employees who explained that the Service Associate role involved more complex and varied work than the eliminated Administrative Assistant role. *See supra* Section I(B).   Rather, Plaintiff testified in her deposition that she had no knowledge of what skills the Service Associate required in any particular department.   Def.'s Mot. Ex. 1 (part 2), Epps Dep. 229:4– 21.

The only evidence Plaintiff offers in support her contention that she would have qualified for any Service Associate position is her own declaration, in which she states that she reviewed a posting for a Service Associate position and concluded that she "performed those same duties during her 12 years at PEPCO." Pl.'s Opp'n at 30; Pl.'s Opp'n Ex. 44, Declaration of Linda Epps ("Epps. Decl.") ¶ 9.   She notes specifically that she engaged in "clerical duties including successful use of computer systems and telephone."   Pl.'s Opp'n at 30.   The fact that Plaintiff may have performed *some* of the tasks indicated in the Service Associate job duties in her role as an Administrative Assistant a decade earlier does not suffice to show that she was "qualified" for any Service Associate position in any department—especially in the face of PEPCO's evidence that the responsibilities associated with this generic title varied significantly depending on the department.

Plaintiff next argues that PEPCO "concealed" several  "available" Service Associate positions from her over the course of several months.   *Id.* at 36.   Before addressing Plaintiff's

---

[5] Plaintiff also cites Ms. Ranta's conclusion that Ms. Epps was "cleared" to return to work as evidence that she was "qualified" to perform the "essential functions of a Service Associate 2." Pl.'s Opp'n at 31.   This argument misses the mark; whether Plaintiff was medically *able* to return to work has no bearing on whether she was *qualified* for a particular position—*e.g.*, that she had the requisite education, skills, or experience to performs the job's functions.

arguments about PEPCO's purported "concealment," the Court shall briefly address Plaintiff's argument that it was improper for PEPCO to "saddle" her with the "responsibility of identifying available positions." *Id.* at 36.  In support of this contention Plaintiff cites a footnote in *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1304 n.27 (D.C. Cir. 1998) for the proposition that "plaintiffs can hardly be expected to hire detectives to look for vacancies." *Id*.  The court in *Aka*, however, was considering the "reassignment obligation" of employers regarding a "reasonable accommodation" claim under the ADA, not a disparate treatment claim.  *Aka*, 156 F.3d at 1304. And even in the reasonable accommodation context, the plaintiff has an "obligation to demonstrate that there existed some vacant position to which [s]he could have been reassigned," and the employer's obligation is "to help [the plaintiff] identify appropriate job vacancies[.]" *Id.* at 1304 n. 27. The record in this case demonstrates that PEPCO *was* helping Plaintiff to identify appropriate job vacancies by conducting its own searches of job postings (both internal and external) and being available to answer Plaintiff's questions about searching the job board.  *See, supra* Section I(B).  Plaintiff and her attorney were also advised to review the job descriptions— not just job titles—to identify potential positions. *See* Def.'s Mot. Ex. 32, 3/26/2018 Email from Karen Gentry-May. The record simply does not support Plaintiff's assertion that she was unilaterally tasked with searching for an open position.

Turning to Plaintiff's claims that PEPCO "concealed" vacant jobs from her—Plaintiff first points to the email conversation between Mr. Davis and Ms. Batres in October 2017 about a forthcoming Service Associate position in Forestville.  *See* Pl.'s Opp'n at 21–22, 37.  Plaintiff contends that she was never told about this vacancy or offered the opportunity to apply for it.[6]  *Id.*

---

[6] Plaintiff also notes that the same email thread refers to two other Service Associate positions at PEPCO's Benning Road Location.  Pl.'s Opp'n at 22–23.  Plaintiff attempts to rely on this evidence

However, PEPCO offers evidence that the company decided this role was not a priority to fill, noting that the posting itself had been pending approval for several months.  Def.'s Mot. Ex. 29, 10/10/2017 Email from Joshua Davis.

Plaintiff further argues that she was informed by the Union president that there was a vacant Service Associate position in the "Power Delivery Administration," about which PEPCO failed to notify her and for which PEPCO "refused" to consider her application.  *See* Pl's Opp'n at 26–27, 37–38.  However, PEPCO has offered evidence to demonstrate not only that this particular department *did not exist*, but also that there were no vacant service associate positions in the department in which Plaintiff worked before she went on leave.  Def.'s Reply Ex. 41, Robinson Decl. ¶ 10 ("[T]here were no Service Associate vacancies in [the Business Planning and Support department] at any time between May 23, 2017 and June 20, 2018[.]"); Def.'s Reply Ex. 48, Gentry-May Decl. ¶ 9 ("There is no Pepco department known as 'Power Delivery Administration[.]'").

Lastly, Plaintiff suggests that Ms. Flack lied to Ms. Townsend in her April 3, 2018 email, in which Ms. Flack stated that "[v]acant and available positions are posted on the Company website" and that Ms. Flack was "not aware of any other positions that are currently vacant."  Pl.'s Opp'n at 23–24 (quoting Pl.'s Opp'n Ex. 41, 4/3/2018 Email from Jill Flack).  Plaintiff cites a later email chain between Ms. Flack and Ms. Batres, discussing positions that "are posted strictly as internal postings," including "union positions" or "supervisory or management positions in which we expect to have internal talent" and identifying several service associate positions that had been posted internally and filled since October 2017.  *Id.* at 24 (Pl.'s Opp'n Ex. 38, 4/4/2018 Email

---

to demonstrate that she was not told about these potential positions, but the very evidence she cites indicates that they were not vacant; rather, one position had been filled and PEPCO had extended an offer for the second position.  Def.'s Mot. Ex. 26, 10/10/2017 Email from Bonnie Batres.

from Bonnie Batres).  Plaintiff contends that PEPCO should have informed her of these internally-posted roles, but purposely did not do so.  However, the email discussion cited by Plaintiff also notes that some of these postings were required to be posted internally due to union agreements. Pl.'s Opp'n Ex. 38, 4/4/2018 Email from Bonnie Batres.  And, in any event, PEPCO offers evidence to establish that its own employees were searching PEPCO's internal cite to identify positions for which they believed she was qualified.  Def.'s Reply Ex. 48, Gentry-May Decl. ¶ 4.

The Court concludes that PEPCO has offered a legitimate, non-discriminatory reason for its decision not to return Plaintiff to work and terminate her employment—which Plaintiff has failed to rebut.  Accordingly, as directed by the D.C. Circuit, the Court turns directly to the central issue: whether Plaintiff has produced evidence sufficient for a reasonable jury to find that PEPCO's stated reason was not the actual reason and that PEPCO intentionally discriminated against Plaintiff based on her disability.

### B.  Plaintiff's evidence is insufficient to establish pretext for discrimination.

Plaintiff argues that PEPCO's reason for failing to reinstate her and terminating her employment were pretext for discrimination based on PEPCO's perception that Plaintiff was disabled.  *See* Pl.'s Opp'n at 31–37.  Evidence of pretext may include "variant treatment of similarly situated employees, discriminatory statements by decision makers, and irregularities in the stated reasons for the adverse employment decision."  *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010) (citing *Brady*, 520 F.3d at 495 n.3).

Plaintiff attempts to rebut PEPCO's proffered reason for terminating her with three categories of evidence of discriminatory "pretext": (1) PEPCO's "shifting reasons" for not returning Plaintiff to work; (2) PEPCO employee's "discriminatory bias"; and (3) Plaintiff's allegations of "comparators." *See* Pl.'s Opp'n at 31–37.  The Court finds none of this evidence

sufficient, individually or collectively, to create a genuine issue of material fact as to whether PEPCO's legitimate, nondiscriminatory reasons for terminating Plaintiff are pretext for disability discrimination.

### 1. PEPCO's "Shifting Reasons"

Plaintiff contends that evidence of PEPCO's "shifting reasons" for not returning her to work casts doubt on its explanation that there was no vacant position for which she was qualified. Pl.'s Opp'n at 31–34. Specifically, Plaintiff claims that Ms. Robertson's determination that she "could not return to work" based on "lack of documentation" conflicts with PEPCO's stated rationale that it did not return Plaintiff to work because there was no available position for which she was qualified. *Id.* at 31–32. Plaintiff argues that a reasonable juror could conclude from this email that PEPCO "was not honestly trying to return Ms. Epps to work" given these "conflicting reasons." *Id.* at 32. Plaintiff's theory appears to be that once Ms. Robertson indicated that she lacked adequate medical documentation, PEPCO's subsequent efforts to identify a vacant position were an effort to "cover up" that it was not genuinely considering her for a position. *Id.* at 32.

As the D.C. Circuit observed in *Brady*, a plaintiff may try to cast doubt on an employer's asserted "legitimate, non-discriminatory reason" for its employment action by pointing to "changes and inconsistencies in [those] stated reasons." 520 F.3d at 495 n.3; *see also Small v. Office of Congressman Henry Cuellar*, 485 F. Supp. 3d 275, 282 (D.D.C. 2020) ("[S]hifting and inconsistent justifications are probative of pretext."). However, courts find such evidence probative of pretext when the employer's stated reason for its adverse employment action evolves over the course of litigation. *See, e.g. Gelata v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (noting that difference between defendant's stated rationale in summary judgment briefing differed from reasons in deposition testimony and interrogatory responses are "probative of pretext"); *Small*, 485

F. Supp. at 281 (observing that defendant-employer stated different reasons for firing plaintiff in summary judgment briefing than in interrogatory responses and depositions).

Here, the record belies Plaintiff's speculation that Ms. Robertson's conclusion that she lacked adequate documentation was *PEPCO's* "real" reason for failing to return her to work. Notably, Plaintiff was *not* terminated from employment after Ms. Robertson concluded that she could not "approve" her return to work and requested accommodations due to "lack of adequate documentation." *See* Def.'s Reply at 10. Rather, PEPCO continued its efforts to identify a position for Plaintiff for several months. *See supra* Section I(B)(2). PEPCO then explicitly put Plaintiff on notice that she had until April 20, 2018 to identify a suitable vacant position for which she could apply—and only terminated Plaintiff after this time period passed. Def.'s Mot. Ex. 29, 1/18/2018 Email from Jill Flack. The Court finds, therefore, that Plaintiff has failed to proffer sufficient evidence to demonstrate that *PEPCO* "shifted' its justification for not returning her to work as pretext for discrimination.

## 2.  PEPCO Employees' "Discriminatory Bias"

Plaintiff next contends that the actions and internal communications of several PEPCO employees reveal a "discriminatory bias," showing that these employees viewed Plaintiff as "mentally unfit" to work due to her history of depressive illness. Pl.'s Opp'n at 32–35. "[E]vidence of discriminatory statements or attitudes on the part of an employer can demonstrate that the employer made an adverse employment decision for a discriminatory reason." *Bennett*, 729 F. Supp. 2d at 67 (citing *Montgomery v. Chao*, 546 F. 3d 703, 708 (D.C. Cir. 2008)). Plaintiff suggests that these communications would allow a reasonable juror to conclude that the "real" reason PEPCO failed to return Plaintiff to work was based on these employees' bias. Pl.'s Opp'n at 34. Plaintiff relies on three primary examples of PEPCO employees' alleged "bias," but fails to

connect any of them to discrimination based on her disability.  Accordingly, the Court  concludes that Plaintiff has failed to offer sufficient evidence to raise an inference of discrimination because of her disability.

*First*, Plaintiff suggests that Ms. Robertson's "ever-increasing demands for medical support to return Ms. Epps to work reveals a discriminatory bias." Pl.'s Opp'n at 32; Def.'s Mot. Ex. 1 (part 1), Epps Dep. 66:4–5 ("They are constantly questioning, asking for medical clearance redundantly.").   Although  the  parties  dispute  whether  Ms.  Robertson  ever  received  the documentation she requested from Plaintiff, *see supra* Section I(B)(1), Plaintiff offers no evidence suggesting that Ms. Robertson requested medical documentation *because of* Plaintiff's depression. Rather, Ms. Robertson testified that, based on PEPCO's policy, she needed certain records to approve Plaintiff's requested accommodations and to ensure that Plaintiff was medically able to perform her work—having been on leave for more than a decade due to medical disability. *See, e.g.*, Def.'s Mot. Ex. 2, Robertson Dep. 32:11–16; 84:9–22; 86:16–19; 96:18–97:1.

*Second*, Plaintiff cites to emails exchanged between PEPCO employees. In one email thread, a PEPCO employee calls Plaintiff "erratic" and "aggressive" and states that Plaintiff screamed at them and hung up on them, which Plaintiff denies.  *See* Pl.'s Opp'n at 34 (citing Pl.'s Opp'n Ex. 18, 5/17/2017 Email from Marie Robertson; Pl.'s Opp'n Ex. 8, 2/23/2017 Email from Joshua Davis). Another PEPCO employee suggested that Plaintiff was "stalking" her, as she obtained the employee's personal cell phone number.  Pl.'s Opp'n at 34 (citing Pl.'s Opp'n Ex. 8, 2/22/2017 Email from Leah Covington). In her deposition, that employee testified that she referenced "stalking" because she was surprised that Plaintiff had obtained her personal cell phone number and used it to call the employee to discus her return to work.  Def.'s Reply Ex. 45, Deposition of Leah Covington ("Covington Dep.") 27:5–20; 28:17–30:19.   Based on these

communications, Plaintiff argues that PEPCO's employees were biased against her due to her "mental state." But Plaintiff fails to explain how these comments about "aggression" and "stalking" evince discrimination based on her *depression*. In her deposition, for example, Plaintiff acknowledged that no one at PEPCO made a single negative remark about her depressive illness, or her medical condition in general. Def.'s Mot Ex. 1 (part 1), Epps Dep. 72:2–73:7. The Court finds that these communications fail to support Plaintiff's inference that the PEPCO employees harbored discriminatory animus based on her depression.

*Third*, Plaintiff claims that Ms. Flack's "immediate reaction" that her requests for accommodation in 2016 were "onerous" and "unreasonable" reveal "harsh judgments" that border on calling Plaintiff "crazy." Pl.'s Opp'n at 35. Plaintiff contends that Ms. Flack's characterization of her accommodation requests could lead a "reasonable juror [to] conclude that management formed its harsh opinion of Ms. Epps and her modest request for accommodation . . . because its decision was made based on her history of mental illness." *Id.* Beyond Plaintiff's speculation, there is *no* evidence in the records supporting her contention that Ms. Flack's reaction was based on discriminatory animus; none of Ms. Flack's communications about Plaintiff's requested accommodation reference Plaintiff's disability. And, in any event, Plaintiff offers no evidence to demonstrate that her requested accommodations in 2016 played any role in PEPCO's decision to terminate her employment in 2018.

The Court finds that none of the evidence of PEPCO's employees purported "discriminatory bias" is sufficient to create a genuine issue of material fact as to whether Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff's employment was pretext for disability discrimination.

### 3. Evidence of Comparators

Finally, Plaintiff claimed in her Complaint and at her deposition that she knew of other PEPCO employees for whom PEPCO had identified new positions when they returned from disability leave. Am. Compl. ¶ 17 ("Pepco has discriminated against Ms. Epps based on her history of disability and Pepco's perception of her disability because other Pepco employees are routinely assigned and reassigned when vacancies become available."); Def.'s Mot. Ex. 1 (part 2) Epps. Dep. 219:17–221:18.  At her deposition, however, Plaintiff was unable to identify the names of any of these purported comparators, let alone any additional information demonstrating that they were similarly situated to Plaintiff.  Def.'s Mot. Ex. 1 (part 2) Epps. Dep. 219:17–221:18.  Plaintiff does not raise any arguments about putative comparators in her summary judgment briefing.

Plaintiff does, however, contend that "PEPCO has never returned a disabled employee to work with or without an accommodation." Pl.'s Opp'n at 25.  Her assertion misstates the record. She relies only on Mr. Davis's deposition testimony, in which he explained that PEPCO sent Section 8.06 Notices to other individuals on disability leave around the same time as Plaintiff. Pl.'s Opp'n Ex. 29, Davis Dep. 20:8–22:1.  He could not recall whether PEPCO brought any of these individuals back to work or whether any of them even attempted to return to work. *Id.*  This testimony does *not* demonstrate—as Plaintiff suggests—that PEPCO *never* returned any employee with a disability to work.

***

In sum, the Court finds that Plaintiff has failed to offer sufficient evidence to demonstrate that PEPCO's stated reason for not returning her to work and terminating her employment was false and that disability discrimination was the real reason for its actions.  Because Plaintiff has

failed to rebut PEPCO's legitimate, non-discriminatory reason for its actions, summary judgment in PEPCO's favor is appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the court grants PEPCO's motion for summary judgment. An appropriate Order accompanies this Memorandum Opinion.

**Dated:** March 31, 2021                                     ___/S/_____
                                                                          COLLEEN KOLLAR-KOTELLY
                                                                          United States District Judge